FILED
2009 Jul-22  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **TIMOTHY RICHARDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  1:07-CV-2038-VEH** |
| | ) | |
| **HONDA MANUFACTURING OF** | ) | |
| **ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff, Timothy Richardson ("Richardson"), initiated this job discrimination case under the Americans with Disabilities Act ("ADA") on November 6, 2007, against Defendant, Honda Manufacturing of Alabama, LLC ("HMA").  (Doc. 1). Richardson filed an amended complaint on February 6, 2008.  (Doc. 14).

Richardson's amended complaint contains one count under the ADA; however that particular count includes several subparts:

> Defendant violated Plaintiff's rights under the ADA by (1) failing to accommodate his disability and/or a disability Defendant regarded Plaintiff as having  by refusing to place him in an available position for which Plaintiff was qualified and could perform the essential functions of, and/or (2) passing Plaintiff over for available positions because of his disability and/or a disability Defendant regarded Plaintiff as having.

(Doc. 14 at 7 ¶ 49).

On December 9, 2008, Richardson filed his Notice of Partial Dismissal (Doc. 29), dismissing his claim that he "was (and is) disabled" under the ADA, but maintaining his claim that HMA regarded him as disabled and violated his rights under the ADA based on that alleged perception:

> Plaintiff henceforth will pursue only the claim that defendant regarded plaintiff as disabled and violated his rights under the ADA because of that. <u>Plaintiff therefore dismisses the claim that he was in fact disabled under the ADA</u>.

(Doc. 29 at 1(emphasis added)).

Pending before the court are two motions:  (1) HMA's Motion for Summary Judgment (Doc. 30) filed on December 15, 2008;[1] and (2) Richardson's Motion for Reconsideration of the Court's Order Striking the McDaniel Declarations (Doc. 53) ("Motion for Reconsideration") filed on April 20, 2009.

Richardson responded to HMA's Motion for Summary Judgment on January 5, 2009.  (Docs. 33, 34).  HMA filed its reply (Doc. 35) on January 16, 2009, in addition to its Motion to Supplement its Evidentiary Submission Or, in the Alternative, Motion to Strike Declaration Submitted by Plaintiff (Doc. 36) ("Motion to Supplement") (relating to non-party witness Shaquetta McDaniel ("McDaniel")).

---

[1] HMA's supporting brief (Doc. 31) and evidence (Doc. 32) were also filed on December 15, 2008.

The court held a telephone conference regarding HMA's Motion to Supplement on January 22, 2009.  (Doc. 37; minute entry dated Jan. 22, 2009).  On February 3, 2009, the court deferred ruling on HMA's Motion to Supplement with the expectation that the parties would take McDaniel's deposition.  (Doc. 40).

The parties encountered difficulties in securing McDaniel's attendance for her deposition and on March 19, 2009, the court entered an order requiring McDaniel "to appear for her deposition in this case on the date and time listed by the parties in the subpoena to be issued by counsel for the parties by March 24, 2009."  (Doc. 48 at 1-2).  The court further indicated that, if Ms. McDaniel did not appear for her deposition, it would "direct the United States Marshal to take Ms. McDaniel into custody for further proceedings."  (*Id.* at 2).

Despite this order, McDaniel still did not appear for her deposition.  The parties then filed separate status reports to the court about how to handle the situation of McDaniel's noncompliance and, relatedly, treat her testimonial declarations.  (Docs. 50, 51).  Based upon these reports, the court entered an order (Doc. 53) striking both declarations by McDaniel and mooting HMA's Motion to Supplement.  This particular order is the subject of Richardson's Motion for Reconsideration.

HMA responded to Richardson's Motion for Reconsideration on May 1, 2009. (Doc. 57).  Richardson filed his reply (Doc. 59) on May 8, 2009.

For the reasons explained below, HMA's Motion for Summary Judgment is due to be granted and Richardson's Motion for Reconsideration is due to be granted to the extent that it seeks this court to address the merits of HMA's Motion for Summary Judgment factoring in only the admissible portions of McDaniel's testimony that are favorable to Richardson.[2]   In all other respects, Richardson's Motion for Reconsideration is due to be denied.

## II.   STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

---

[2]   The court's reasoning behind its decision to strike both of McDaniel's declarations in this case stemmed in part from its grave concerns about the overall reliability of such evidence, given McDaniel's repeated refusal to appear for a deposition.  The specific relief requested by Richardson in the Motion for Reconsideration includes an order from the court that "McDaniel be escorted to her deposition by the Marshals" and, alternatively, that the court "reinstate McDaniel's declaration filed by plaintiff[.]" (Doc. 53 at 4 ¶ 8).  Due to a scarcity of resources, the court is unwilling to utilize the United States Marshal Service to secure a nonparty witness' attendance for a deposition in a civil case.  Therefore, to the extent Richardson's Motion for Reconsideration seeks such relief, it is due to be denied.  However, because the court has determined that summary judgment in favor of HMA is appropriate <u>even when only considering McDaniel's testimony that is favorable to Richardson</u>, and because the court has done so, the court will reinstate McDaniel's affidavit filed by Richardson.  (Doc. 33 at Ex. 1).

4

Cir. 1993).[3]  A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).

## III.   STATEMENT OF FACTS[4]

### A.   HMA

HMA employs approximately 4,500 individuals at its Lincoln, Alabama plant,

where Process Associates perform the daily tasks of assembling Honda Odyssey and

Pilot vehicles.  AF No. 1.[5]  Process Associates in the Assembly Frame Department

---

[3]  Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

[4]  Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick*, 2 F.3d at 1115. Therefore, these are the facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[5]  Facts not disputed by Richardson are admitted for summary judgment purposes. Moreover, when Richardson states that facts are disputed but fails to point to any record evidence disputing HMA's version of the facts, and where HMA's record citation of evidence allegedly supporting a disputed fact in fact does support that fact, such facts are also deemed admitted, consistent with Appendix II of the court's Uniform Initial Order. (Doc. 6). The designation "AF" stands for admitted fact and indicates a fact offered by HMA with supporting evidence that Richardson

5

("AFD") use tools to attach parts to the frame of the vehicle and are required to bend, lift, use their hands and arms, and stand during their eight-hour shift for more than three hours per day.  AF No. 4.

HMA associates who have permanent medical restrictions preventing them from performing the essential functions of their job are eligible to participate in HMA's ADA placement process, which takes place over a course of sixty days.  AF No. 11.  HMA's Associates Relations ("AR") team receives advice from HMA's in-house legal team, onsite medical services provider, and Safety Department to determine whether, based on the information provided by an associate, he or she is ADA-qualified and what accommodations, including transfer, are reasonable and/or necessary.  AF No. 13.

### B.    Richardson's Employment with HMA

Richardson applied for employment with HMA on May 12, 2001.  AF No. 19. Before starting work at HMA, Richardson underwent a post-conditional offer medical

---

has failed to refute with evidence or has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case.  Whenever Richardson has disputed with evidence a fact offered by HMA, the court has accepted Richardson's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of HMA's statement of facts as set forth in Doc. 31 and responded to by Richardson in Doc. 34. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

examination.  AF No. 20.

As part of this medical review, Richardson disclosed that he had neurofibromatosis but did not identify any working restrictions due to this medical condition as it did not affect his capacity to work at HMA until about three years later.  AF No. 21.  Richardson began working as a Process Associate on August 6, 2001, in the AFD, and was physically able to perform all of his job duties at the time of his hire with no accommodations requested.  AF No. 22.

### C.    Richardson's Neurofibromatosis

Richardson, who has had neurofibromatosis since birth, was diagnosed in 1984.  AF No. 23.  Neurofibromatosis is a genetic condition that causes tumors to grow on nerves.  AF No. 24.

Richardson's neurofibromatosis is primarily localized on the lower left side of his body, which causes swelling in his left leg, exacerbated by long periods of standing and extensive walking.  AF No. 25.  In July 2006, Richardson went on non-occupational medical leave to have tests performed related to his neurofibromatosis and began receiving disability benefits from HMA.  AF No. 26.

### D.    Richardson Reports His Work-Related Restrictions to HMA

Richardson was released to return to work from his non-occupational leave in September 2006, with restrictions from his physician, Dr. John Brockington ("Dr.

Brockington"), of no prolonged standing or walking.  AF No. 27.  On October 2, 2006, Dr. Brockington assigned Richardson the following restrictions: sitting a maximum of five hours per day; standing a maximum of three hours per day; walking a maximum of three hours per day; no bending, stooping, twisting, crawling, squatting, working at heights, working in confined spaces, crouching, climbing, or operating foot controls with his left foot.  AF No. 28.

Neither Richardson's September 2006 return to work form nor Dr. Brockington's October 2, 2006, evaluation stated whether his restrictions were permanent.  AF No. 29.  HMA later learned from its disability management provider that Richardson's restrictions had no end date.  AF No. 30.

### E.    Richardson's Reasonable Accommodation Request

In a letter dated October 12, 2006, Richardson requested a reasonable accommodation under the ADA and stated that he could perform any job duty as long as it did not conflict with the restrictions set out by Dr. Brockington.  AF No. 31.  On October 17, 2006, HMA sent Dr. Brockington a questionnaire regarding Richardson's condition and restrictions, on which Dr. Brockington stated for the first time that Richardson's restrictions were permanent.  AF No. 32.

The ADA placement process began on October 30, 2006.  AF No. 34. Although no one at HMA told Richardson how long this process would last, it

8

continued for a period of sixty days, until January 13, 2007. *Id.*; (Doc. 34 at 10 ¶ 34).

Deverick Williams ("Williams"), an Administrator in AR, conducted Richardson's placement search in accordance with HMA's policy and consulted HMA plant safety representatives, department level safety representatives, and HMA legal during the placement process. AF No. 35. Richardson submitted his resume to Williams to facilitate the search and specifically identified the tugger/tow motor and forklift operator positions as jobs he believed he could perform with his restrictions. AF No. 36.

During the placement search, Williams used HMA's staffing department to determine manpower needs plant-wide; sent an email to department supervisors requesting open positions that met Richardson's restrictions; and met with department safety representatives to determine the physical requirements for any open positions. AF No. 37. Williams's search encompassed all departments, including PMC, to which Process Associates operating tuggers/tow motors and forklifts are assigned. AF No. 38.

During the sixty-day placement process, Williams searched all open Process Associate positions and professional opportunities available. AF No. 39. HMA relied upon the restrictions assigned by Dr. Brockington in determining whether Richardson could be placed in any open position. AF No. 42. The only tugger

9

positions identified by Williams as being available during his search were stand-up ones.  (Doc. 32 at Ex. D at 12-13 ¶ 30 ("[T]he available tugger/tow motor positions required associates to stand on the tugger, get on and off the tugger repetitively throughout the day, and lift parts in order to deliver them to the assembly line.").

In a letter to HMA dated February 15, 2007, Dr. Brockington stated that, while Richardson's condition is permanent, his restrictions are not, as they could worsen, improve, or stay the same.  AF No. 44.  The February 15, 2007, letter further stated that Richardson was capable of working, aside from the restrictions indicated on October 2, 2006.  AF No. 45.

### F.   Richardson's Return to Work

In May 2008, just two months before his 24-month non-occupational medical leave was due to expire, Richardson was released by Dr. Brockington to return to work without any restrictions.  AF No. 47.  Richardson was aware that he would be terminated if he did not return to work from his non-occupational medical leave within two years.  AF No. 48.

Prior to May 2008, Richardson provided no information to Williams or anyone else at HMA that his restrictions had changed.  AF No. 49.  Since his return to work, Richardson has performed the full duties of the primer, speaker, and liner processes on the door line in AF without any accommodation.  AF No. 50.

Richardson's current position requires him to bend, lift, place parts, fasten parts together with his hands and tools, and remain standing during his eight-hour shift. AF No. 51. Richardson, like all Process Associates, receives assistance whenever he falls behind on one of his processes. AF No. 52. Richardson has not been issued any corrective actions for performance or disciplinary problems since his return. AF No. 53.

### G.     Richardson's "Regarded As" Allegations

Richardson  bases his "regarded as" claim in part on Williams telling him that he did not believe that Richardson could perform any positions at the plant, stating that HMA does not accommodate restrictions, and not placing him in a position.  AF No. 58.  Richardson also relies upon the facts that Williams had to have considered Richardson as disabled per HMA policy to have conducted the job search for him and that HMA admitted that Williams considered Richardson to have been disabled in its response to Richardson's first request for admissions.  (Doc. 34 at 12 ¶ 58).

Richardson's expert, Patsy Bramlett ("Bramlett"), submitted a report on July 3, 2008, concluding that HMA regarded plaintiff as disabled.  AF No. 60.  Bramlett has never been to HMA's plant, never had any interaction with Richardson, Williams, or anyone else at HMA, is not aware of the open positions searched by Williams or the essential functions of those positions, and was not aware that Richardson returned

to work without any restrictions in May 2008.  AF No. 62.

### H.    Richardson's Reasonable Accommodation Allegations

Richardson also alleges that HMA failed to accommodate him by refusing to place him in an available position and/or passing him over for available positions because of a perceived disability.  AF No. 63.  However, Richardson has no personal knowledge of what Williams or anyone else at HMA did to try to find an open job position for him consistent with his assigned restrictions.  AF No. 64.

Richardson contends that he could have performed the tugger/tow motor operator and forklift operator jobs with his restrictions and that others were placed in these positions, but does not know these individuals' respective job qualifications. AF No. 65.  Richardson has never performed the tugger/tow motor or forklift operator jobs and does not know the essential job functions or physical requirements of these positions.  AF No. 66.

Richardson also maintains that he was qualified to perform test driving jobs, but no such position exists at HMA; rather, test driving is a only a task within a job position in HMA's vehicle quality area and that job position requires Process Associates to stand six to seven hours per day.  AF No. 67.

## IV.   ANALYSIS

### A.    Preliminary Considerations

12

The court notes that, both in moving for summary judgment and in opposing, neither side has addressed the potential impact, if any, that the ADA Amendments Act of 2008 ("ADAAA") would have on the claims and defenses in this case.[6]  Based

---

[6]  The ADAAA provides in part that:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(i)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

**(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

**(II)** use of assistive technology;

**(III)** reasonable accommodations or auxiliary aids or services; or

upon this court's independent research, it appears that the issue of any retroactive

application relating to the ADAAA is still an open question within the Eleventh

Circuit.  As the unpublished per curiam Eleventh Circuit decision of *Shannon v.*

*Potter*, No. 08-16827, 2009 WL 1598442 (11th Cir. June 9, 2009), notes:

> The ADAAA changes the definition of major life activities to
> include lifting.  This amendment became effective January 1, 2009, after
> the district court issued its order granting summary judgment in the
> instant case.  <u>This court has not yet issued a published opinion</u>
> <u>addressing the potential retroactive effect of the ADAAA</u>, and need not
> do so here because Shannon has not established that he is a "qualified
> individual."

2009 WL 1598442, at *2 n.5 (emphasis added).

———————————

> **(IV)** learned behavioral or adaptive neurological
> modifications.

42 U.S.C. § 12102(4)(A)-(E)(i).  Relatedly, the last stated purpose of the ADAAA

calls for a broadening of the term "substantially limits":

> **(6)** to express Congress' expectation that the Equal Employment
> Opportunity Commission will revise that portion of its current
> regulations that defines the term 'substantially limits' as 'significantly
> restricted' to be consistent with this Act, including the amendments
> made by this Act [ADA Amendments Act of 2008, Pub. L. 110-325,
> Sept. 25, 2008, 122 Stat. 3553, enacting 42 U.S.C.A. §§ 12103 and
> 12205a, amending this section, and 29 U.S.C.A. § 705, 42 U.S.C.A. §§
> 12102, 12111 to 12114, 12201, and 12210, redesignating 42 U.S.C.A.
> §§ 12206 to 12213, and enacting provisions set out as notes under this
> section and 29 U.S.C.A. § 705].

Pub. L. 110-325, § 2, Sept. 25, 2008, 122 Stat. 3553.

Prior to the issuance of *Shannon*, in another unpublished per curiam decision, the Eleventh Circuit indicated that the ADAAA should not apply retroactively:

> Congress recently enacted major changes to the ADA. By adoption of the Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), effective 1 January 2009, Congress has expressly instructed courts that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals." Pub. L. No. 110-325, § 4(a). Plaintiff makes no argument that the amendments should apply retroactively; and <u>absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."</u> *Landgraf v. USI Film Products*, 114 S. Ct. 1483, 1505 (1994). So, we look to the ADA as it was in effect at the time of the alleged discrimination.

*Fikes v. Wal-Mart, Inc.*, No. 08-12773, 2009 WL 961774, at *1 n.1 (11th Cir. 2009) (emphasis added). However, because *Fikes* is unpublished, it is not binding on the Eleventh Circuit or this court, is comparable to decisions issued by other circuit or district courts, and, therefore, at best, is only persuasive authority. *See, e.g., Baker v. Birmingham Board of Education*, 531 F.3d 1336, 1338 (11th Cir. 2008) ("[B]ecause *Palmer* is an unpublished decision, it is not binding precedent.") (citing *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007); 11th Cir. Rule 36-2).

Additionally, the Fifth Circuit has determined in a published decision that the "changes" contained in the ADAAA "do not apply retroactively." *E.E.O.C. v. Agro*

15

*Distribution, LLC*, 555 F.3d 462, 469 n.8  (5th  Cir. 2009) ("'Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear.'") (citing *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)); *see also Kiesewetter v. Caterpillar, Inc.*, No. 08-2140, 2008 WL 4523595, at *1 (7th Cir. Oct. 9, 2008) ("We use the laws and interpretations that were in force when the complained-of acts occurred.") (citing *Landgraf v. USI Film Products*, 511 U.S. 244 (1994)).

In contrast, the Ninth Circuit, while not deciding the retroactivity issue, still used the ADAAA in its analysis in a reversal of summary judgment in favor of the employer in *Rohr v. Salt River Project Agricultural Imp. & Power District*, 555 F.3d 850, 853 (9th Cir. 2009) ("We therefore need not decide whether the ADAAA, which took effect on January 1, 2009, applies retroactively to Rohr's claims."); *Rohr*, 555 F.3d at 861 ("Nevertheless, because the ADAAA sheds light on Congress' original intent when it enacted the ADA, a brief discussion of the amendment is appropriate.").

Finally, in an unpublished decision, the Sixth Circuit concluded that the ADAAA applies retroactively to claims that seek prospective injunctive relief (*i.e.*, "the right to receive an accommodation on a test that will occur in the future"). *See*

*Jenkins v. National Bd. of Medical Examiners*, No. 08-5371, 2009 WL 331638, at *1 (6th Cir. Feb. 11, 2009) ("Rather than seeking damages for some past act of discrimination by NBME, Jenkins seeks the right to receive an accommodation on a test that will occur in the future, well after this effective date."); *Jenkins*, at *1 ("Because Jenkins seeks prospective relief, no injustice would result from applying the amended law.").

Having studied these cases in the absence of any controlling authority from the Eleventh Circuit this court is persuaded to follow the Fifth Circuit's reasoning in *Agro* and analyze Richardson's disability claim under the ADA rather than the ADAAA. In particular, this court is guided by the Supreme Court's discussion in *Rivers* (addressing the impact of Congress's decision to amend 42 U.S.C. § 1981 in light of the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), *superseded by statute as stated in Stender v. Lucky Stores, Inc.*, 780 F. Supp. 1302, 1305 (N.D. Cal. 1992)), upon which the *Agro* court relies, in determining that the ADAAA should not apply retroactively to Richardson's claims:

> "The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student," *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S. Ct. 407, 413, 74 L. Ed. 2d 235 (1982), and this case illustrates the second half of that principle as well as the first. Even though applicable Sixth Circuit precedents were otherwise when this dispute arose, the District Court properly applied *Patterson* to this case. *See Harper v.*

*Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S. Ct. 2510, 2512, 125 L. Ed. 2d 74 (1993) ( "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"). *See also Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372, 30 S. Ct. 140, 148, 54 L. Ed. 228 (1910) ("Judicial decisions have had retrospective operation for near a thousand years") (Holmes, J., dissenting). The essence of judicial decisionmaking-applying general rules to particular situations-necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation. *See* L. Fuller, Morality of Law 56 (1964) ("No system of law-whether it be judge-made or legislatively enacted-can be so perfectly drafted as to leave no room for dispute").

*Patterson* did not overrule any prior decision of this Court; rather, it held and therefore established that the prior decisions of the Courts of Appeals which read § 1981 to cover discriminatory contract termination were incorrect. They were not wrong according to some abstract standard of interpretive validity, but by the rules that necessarily govern our hierarchical federal court system. *Cf. Brown v. Allen*, 344 U.S. 443, 540, 73 S. Ct. 397, 427, 97 L. Ed. 469 (1953) (Jackson, J., concurring in result). It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law. A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction. Thus, *Patterson* provides the authoritative interpretation of the phrase "make and enforce contracts" in the Civil Rights Act of 1866 before the 1991 amendment went into effect on November 21, 1991. That interpretation provides the baseline for our conclusion that the 1991 amendment would be "retroactive" if applied to cases arising before that date.

Congress, of course, has the power to amend a statute that it

18

believes we have misconstrued.  It may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product.  No such change, however, has the force of law unless it is implemented through legislation.  Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the "corrective" amendment must clearly appear.  We cannot say that such an intent clearly appears with respect to § 101. For this reason, and because it creates liabilities that had no legal existence before the Act was passed, § 101 does not apply to preenactment conduct.

*Rivers,* 511 U.S. at 311-13 (emphasis added) (footnote omitted).

By way of a footnote, as the Supreme Court further clarified in *Rivers*:

When Congress enacts a new statute, it has the power to decide when the statute will become effective.  The new statute may govern from the date of enactment, from a specified future date, or even from an expressly announced earlier date.  But when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law.  In statutory cases the Court has no authority to depart from the congressional command setting the effective date of a law that it has enacted.  Thus, it is not accurate to say that the Court's decision in *Patterson* "changed" the law that previously prevailed in the Sixth Circuit when this case was filed. Rather, given the structure of our judicial system, the *Patterson* opinion finally decided what § 1981 had always meant and explained why the Courts of Appeals had misinterpreted the will of the enacting Congress.

*Rivers*, 511 U.S. at 313 n.12 (emphasis added).

Comparable to the analysis surrounding Congress' 1991 amendment to § 1981 in *Rivers*, there is no provision within the ADAAA that clearly shows an intent by

Congress to make it applicable to "preenactment conduct."  Therefore, this court

agrees with *Agro* and holds, based upon the principles outlined in *Rivers*, that it is

appropriate to analyze the viability of Richardson's disability claim under the ADA

as opposed to the ADAAA.[7]

---

[7]   The court notes that the scope of this holding does not encompass the treatment of a request for a *Jenkins*-like future accommodation under the ADA and whether the ADAAA should apply retroactively in that type of situation because, unlike the plaintiff in *Jenkins* who sought "an accommodation on a [future] test[,]" based upon his complaint and opposition to summary judgment, Richardson primarily seeks redress in the form of monetary relief, including "back-pay with interest, and ordering [HMA] to pay liquidate[d], compensatory and punitive damages as a jury may assess" (*see* Doc. 14 at 8 ¶ (iii)), for past purported discriminatory acts on the basis of perceived disability.  As the court pointed out in *Jenkins*, a key question to ask regarding the scope of permissible retroactive application is "'whether the new provision attaches new legal consequences to events <u>completed before its enactment</u>.'" *Jenkins*, at *2 (emphasis added) (citation omitted).  In this instance, the conduct about which Richardson complains all occurred <u>prior to the ADAAA's enactment</u> and, although he does generally state in his complaint that he is seeking injunctive and other equitable relief (*see, e.g.*, Doc. 14 at 7-8 ¶¶ (ii), (iv)), <u>Richardson seeks no specific prospective injunctive relief relating to HMA's future treatment of him post-enactment</u>.

Alternatively, Richardson has abandoned any claim for prospective injunctive relief that may have been contained in his amended complaint.  *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999)

**B.     Richardson's *Prima Facie* Case of Disability Discrimination**

Regarding establishment of a *prima facie* case of disability discrimination

under the ADA,[8] the Eleventh Circuit has explained:

> The ADA mandates that employers shall not discriminate against
> "a qualified individual with a disability because of the disability of such
> individual in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee compensation, job
> training, and other terms, conditions, and privileges of employment." 42
> U.S.C. § 12112(a).  The familiar burden-shifting analysis of Title VII
> employment discrimination actions is equally applicable to ADA claims.
> *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir.
> 1996). Thus, Hilburn has the burden of proving a prima facie case of
> disability discrimination by a preponderance of the evidence, which
> requires a demonstration that she (1) is disabled, (2) is a qualified
> individual, and (3) was subjected to unlawful discrimination because of
> her disability.  42 U.S.C. §§ 12112(a); *see Morisky v. Broward County,*

---

(claim may be considered abandoned when district court is presented with no
argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler
Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568
(11th Cir. 1994) (concluding that a district court "could properly treat as abandoned
a claim alleged in the complaint but not even raised as a ground for summary
judgment").  Relatedly, the court is under no independent obligation to develop
grounds in opposition to summary judgment on behalf of Richardson as "the onus is
upon the parties to formulate arguments[.]"   *Dunmar*, 43 F.3d at 599 (citation
omitted); *see also id.* ("There is no burden upon the district court to distill every
potential argument that could be made based upon the materials before it on summary
judgment.") (citation omitted)).

   [8]  As discussed *infra*, disability is defined three ways under the ADA: actual,
perceived, and having record of.  The overall framework set out in this action applies
to all three definitions.  In this instance, Richardson has dropped his actual disability
claim and is only pursing his regarded as disabled claim.  (Richardson never asserted
a having record of claim.)

80 F.3d 445, 447-49 (11th Cir.1996). Having concluded that Hilburn had not established any genuine issue of a material fact relating to the first *prima facie* factor of disability, the trial court did not address the last two factors. *See Hilburn*, 17 F. Supp. 2d at 1383. Therefore, we will limit our discussion to whether Hilburn can be considered disabled within the meaning of the ADA.

The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Additionally, Hilburn must establish that Murata had actual or constructive knowledge of the disability or considered her to be disabled. *Morisky*, 80 F.3d at 448.

The ADA defines a "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.

42 U.S.C. § 12102(2). Hilburn must be deemed to be "disabled" for purposes of the ADA if she satisfies any one of these three definitions. However, a physical impairment alone is not necessarily a disability under the ADA. *Pritchard*, 92 F.3d at 1132. Commentary to the federal regulations contains a non-exclusive list of conditions that constitute a physical impairment. For the purposes of Hilburn's personal disability claim, it is significant that heart disease is included in this listing. 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997). Courts, including the Eleventh Circuit Court of Appeals (Eleventh Circuit), frequently look to EEOC regulations to assess the next analytical step of determining whether a physical impairment substantially limits a major life activity. *See, e.g., Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

These regulations explain that the term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i), (ii) (1997). Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2( i ) (1997). With respect to the major life activity of working, the regulations explain that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (1997).

*Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226-27 (11th Cir. 1999) (emphasis added) (footnote omitted).

### 1.    Essential Function/Qualified Individual

HMA initially challenges Richardson's ability to establish a *prima facie* case on the basis that because he "cannot perform an essential function of the position he holds or desires with or without reasonable accommodation, he is not 'otherwise qualified' for the position[.]" (Doc. 31 at 20 (citation omitted)). More specifically, HMA contends that:

[E]ven assuming [Richardson] was, in fact, disabled or regarded as such, he was not qualified for the Process Associate position he held or any

other position he sought.  It is undisputed that Process Associates must stand for more than three hours per day.  (Facts, ¶3).  Additionally, Process Associates must be able to bend, lift and stoop while performing their processes.  (Facts, ¶¶3-4, 51).  Plaintiff, in his Process Associate position, was required to perform these essential functions both before and after his non-occupational medical leave.  (Facts, ¶¶3-4, 22, 50-51).

Dr. Brockington's September and October 2006 restrictions made clear that plaintiff could not stand or walk for more than three hours daily, twist, crawl, bend, or stoop.  (Facts, ¶¶27-28).  Without the ability to stand or walk for more than three hours per day, plaintiff could not perform the essential functions of the Process Associate position. (Facts, ¶¶3-6, 51); *see, e.g., Firth v. St. Microelectronics, Inc.*, 2001 WL 1685532 (N.D. Tex. Oct. 29, 2001) (holding that plaintiff could not perform essential function of manufacturing position due to standing restriction and was therefore not a "qualified individual").  At no point prior to his return to work in May 2008 did plaintiff or Dr. Brockington inform HMA of any change to these restrictions which would render him qualified for the Process Associate position.  *See Reed v. Heil Co.*, 206 F.3d 1055, 1062-63 (11th Cir. 2000) (holding plaintiff with lifting restrictions not qualified for welder position where he never advised employer of change in restrictions).

Just as Dr. Brockington's restrictions rendered plaintiff unqualified for the Process Associate position he held in Assembly Frame, the same restrictions also made him unqualified for the Process Associate positions in the PMC department in which he sought placement. Again, it is undisputed that an essential function of the tugger/tow motor and forklift operator positions is standing in excess of the restrictions assigned plaintiff by Dr. Brockington.  (Facts, ¶¶3-7). Plaintiff never performed these jobs and does not know the physical requirements of these positions.  (Facts, ¶¶65-66).  Because plaintiff was limited to standing no more than three hours per day, he was not qualified for the tugger/tow motor and forklift operator functions of the Process Associate position.

Additionally, plaintiff was not qualified for the "test driver"

24

position in which he contends he should have been placed.  Plaintiff never performed this function and does not know its essential functions or physical requirements. (Facts, ¶67). Instead, the undisputed evidence shows that test driving is but one task with[in] the Vehicle Quality department, and this task also requires Process Associates to stand six to seven hours daily. (Facts, ¶67).  Plaintiff, therefore, was not qualified to perform the "test driving" function.

(Doc. 31 at 21-22 (emphasis omitted)).

With respect to essential functions of a position, "<u>consideration shall be given to the employer's judgment</u> . . .  and [,] <u>if</u> an employer has prepared a written description . . . for the [claimant's] job, this description shall be considered evidence of the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001) (emphasis added ) (citing *Earl v. Meryns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)).  Relatedly, the ADA does not mandate the creation of job descriptions to substantiate the essential functions of a position.  *See* 29 C.F.R. § 1630.29(n)(3) ("Evidence of whether a particular function is essential <u>includes, but is not limited to</u>:  . . . (ii) Written job descriptions prepared before advertising or interviewing applicants for the job[.]") (emphasis added).

An accommodation is reasonable only if it enables a plaintiff to perform the essential functions of his job. *Lucas*, 257 F.3d at 1255.  "Essential functions" are fundamental job duties, as opposed to "marginal functions." 29 C.F.R. § 1630.2(n)(1); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).

Determining whether a particular job duty is an essential function requires a factual inquiry to be conducted on a case-by-case basis. *Lucas*, 257 F.3d at 1258.

Richardson's efforts to refute HMA's position concerning the essential function of standing for more than three hours are, for the most part, unavailing.  In particular, in opposition to summary judgment, Richardson's counsel essentially argues, without pointing to any supporting evidence, that standing for more than three hours cannot be an essential function of every HMA Process Associate position. (Doc. 34 at 19-20).  However, "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[9]

Richardson also faults HMA for not maintaining any written job descriptions that detail the essential functions of each position.  However, the mere lack of a written job description does not, of itself, create a material factual dispute as to this issue.  *See* discussion, *supra*, pp. 24 - 25.  *Cf. E.E.O.C. v. Circuit City Stores, Inc.*, No. 1:04CV00183, 2005 WL 1474025, *4 (M.D.N.C. June 21, 2005) (determining that an employer's failure to discipline an employee for tardiness and the lack of a formal "policy regarding absences or of a written description of Mr. Moses's position describing a certain level of attendance as a necessary element of a job" creates a jury

_____

[9]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

issue as to whether regular attendance  is an essential function).

The notable exception to Richardson's general lack of evidence, however, involves the sit-down tugger position as substantiated by McDaniel's testimony:

> Moreover, Richardson has presented evidence that refutes this claim as to the particular job at issue: the tugger operator position. Richardson has presented evidence from a two-year veteran at the position that there are sit-down tuggers readily available to operators, and that operating a sit-down tugger involves standing significantly less than three hours a shift. Richardson could have operated a sit-down tugger (which apparently is the less popular type among operators) and easily stayed within his restrictions. Consequently, Richardson has presented sufficient evidence disputing any claim that standing for more than three hours is an essential function of the tugger operator position.

(Doc. 34 at 20 (emphasis added) (footnote omitted)).

Further, the court agrees with Richardson that, to the extent this sit-down tugger position requires some bending when placing wires in low feeder racks, a material factual dispute exists over whether such a function is "essential" or "marginal" with respect to the performance of the job.  *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) ("The ADA's implementing regulations provide that '[t]he term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires,' and 'does not include the marginal functions of the position.' 29 C.F.R. § 1630.2(n)(1).").  In particular, taking the evidence in a light most favorable to

27

Richardson, these wires are normally delivered by stand-up tuggers and, regardless, "'the amount of time spent on the job performing the function'" has not been undisputedly shown to be significant. *D'Angelo*, 422 F.3d at 1230 (citation omitted). Accordingly, the court concludes that Richardson has adequately demonstrated the existence of a material factual dispute over whether standing for more than three hours and bending are essential functions of the sit-down tugger position and, therefore, summary judgment in favor of HMA as to the essential functions of that particular job is not appropriate.

### 2.   Regarded As Disabled

HMA also attacks Richardson's ability to establish a *prima facie* case of disability discrimination under the regarded-as prong on the basis that he lacks sufficient evidence that HMA regarded him as "having a physical or mental impairment substantially limiting one or more major life activities." (Doc. 31 at 24 (citation omitted)). As the Eleventh Circuit has elaborated , "[u]nder the 'regarded as' prong, a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception." *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004) (emphasis added) (citation omitted). "As with actual impairments, however, the perceived impairment must be one that, if real, would limit substantially a major life activity of

the individual." *Id.* (emphasis added) (citations omitted).

The court rejects HMA's regarded-as argument on summary judgment, particularly in light of its express admission made during the course of the parties' paper discovery conducted in this case that "Deverick Williams considered plaintiff to be ADA-qualified for the purposes of conducting a restriction placement search." (Doc. 33 at Ex. 2 at HMA's Revised Response to Plaintiff's First Request for Admission of Facts at No. 7 (emphasis added)).  At a minimum, this admission creates a material factual dispute as to whether HMA regarded Richardson as disabled due to his neurofibromatosis and related doctor-ordered work restrictions.  *See, e.g., Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004) (determining that placing police offers on light duty "certainly suggest[ed] that the City regarded them as being substantially limited as to working as police officers in general.").

### 3.   Evidence of Discrimination

HMA additionally argues that Richardson cannot satisfy the third element of his *prima facie* case because "[t]here is no evidence that anyone at HMA, including Williams, treated plaintiff less favorably than any other associate based on knowledge of his neurofibromatosis or related restrictions."  (Doc. 31 at 27).  As Richardson's disability claim is not premised upon disparate treatment, but rather a failure to make a reasonable accommodation, this particular ground offered by HMA in support of

29

summary judgment is misplaced. *See, e.g., Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("The district court's implication that Holly was required to prove disparate treatment reflects, we believe, <u>a misunderstanding of the fundamental nature of a reasonable accommodation claim under the ADA</u>.") (emphasis added); *id.* at 1263 ("In sum, the fact that Holly's non-disabled co-workers were equally subjected to Clairson's punctuality policy is not relevant to the question whether Clairson discriminated against Holly by failing to reasonably accommodate his disability, and it was error for the district court to hold otherwise.") (footnote omitted); *id.* at 1262 ("Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship.").

As one district court has distinguished the frameworks applicable to disparate treatment versus reasonable accommodation claims under the ADA:

**1.    Burdens of Proof**

*a.    Disparate treatment/termination claim*

A disparate treatment claim is evaluated under the traditional *McDonnell Douglas* burden-shifting framework. *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000).  Under this approach, the employee must first establish a prima facie case of discrimination.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n. 3, 124 S. Ct. 513, 157 L. Ed. 2d 357

(2003).  The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action.  *Id.*  If the employer meets this burden of production, the employee may still prove disparate treatment, for instance, by demonstrating the employer's reason is pretextual.  *Id.*

b.    *Failure to accommodate claim*

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  In a claim for failure to make reasonable accommodations, the traditional *McDonnell Douglas* burden-shifting is modified.  *Fenney v. Dakota, Minn. & E.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).  In addition to setting forth the prima facie case, Plaintiff must identify a reasonable accommodation that would allow him to perform the job.  *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998).  Once the plaintiff has met this burden, the defendant employer may rebut the claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer.  *Id.*

*McCoy v. Geico General Ins. Co.*, 510 F. Supp. 2d 739, 748 (M.D. Fla. 2007).

The cases cited in *McCoy* make it clear that Richardson's failure to reasonably accommodate claim is not defeated, as HMA contends, by a lack of any comparator evidence.

## C.    **Pretext**

HMA further maintains that Richardson's inability to show pretext provides an alternative basis for summary judgment.  However, as stated above, because this is exclusively a failure to accommodate case, evidence of pretext plays no role in the

analysis. *See, e.g.*, *Holly*, 492 F.3d at 1262 ("There is no additional burden on Holly to show that Clairson enforced its punctuality policy in a discriminatory manner by granting leniency under the policy to Holly's non-disabled co-workers while denying Holly the same leniency, nor any subsequent burdens on Clairson to show that it had 'any legitimate non-discriminatory reasons for terminating Holly' or on Holly to 'establish that these reasons were pretextual.'") (emphasis added) (citation and footnote omitted). Therefore, summary judgment is not appropriate based upon this alternative ground.

### D.   Failure to Reasonably Accommodate

Finally, HMA asserts that, even assuming that it regarded Richardson as disabled, he is still unable to substantiate his claim that HMA failed to reasonably accommodate him. The court agrees.

> To establish a claim of failure to reasonably accommodate a disability, a plaintiff must prove: (1) she has a disability within the meaning of the statute; (2) defendant had notice of her disability; (3) with a reasonable accommodation she could perform the essential functions of her position; and (3) [sic] the defendant refused to make such accommodations. *See Stone v. City of Mt. Vernon*, 118 F.3d 92, 96-97 (2d Cir.1997); *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir.2002); *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 165 (3d Cir.1999). An employer must provide reasonable accommodations for employees with known disabilities unless the accommodations would cause undue hardship to the employer. *Earl v. Meryns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Accommodations are reasonable, and thus required under the Act, only if they allow the employee to perform her

> essential job functions. *Id.* Plaintiff has the burden of identifying a reasonable accommodation that would allow her to perform the essential functions of her job. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997).

*Darwin v. Principi*, No., 2006 WL 5079473, at *13 (M.D. Fla. June 15, 2006) (emphasis added).

"[T]he use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." *Stewart*, *supra*, 117 F.3d at 1285. "[P]laintiff does not satisfy her initial burden by simply naming a preferred accommodation–even one mentioned in the statute or regulations; she must show that the accommodation is 'reasonable' given her situation." *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) (emphasis added) (citing *Stewart*, 117 F.3d at 1286). A plaintiff must prove that the accommodation is reasonable to establish a *prima facie* case. *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).

In this instance, Richardson's failure to accommodate claim does not survive summary judgment because he has not met his "burden of identifying a reasonable accommodation that would allow [him] to perform the essential functions of [his] job." This is true because, even taking into consideration the testimony of McDaniel that is favorable to Richardson, he cannot maintain his reasonable accommodation

claim.

More specifically, McDaniel has testified that the sit-down tugger position involved standing for less than three hours per shift and only very limited bending. Based upon this evidence, Richardson maintains that working as a sit-down tugger would be consistent with his job-related restrictions and thus a reasonable accommodation for him.

However, regardless of whether Richardson could perform the essential functions of the sit-down tugger position as characterized by McDaniel, HMA is correct that, factually, the record does not substantiate the existence of an open sit-down tugger position.  As the Eleventh Circuit held in *Lucas*, "[b]ecause there was no vacancy at the Marietta Boulevard facility for Customer Service Representative, reassigning Lucas to that position would have required Grainger to bump another employee from it, and that is not required by the ADA."  *Id.* at 1257 (emphasis added) (footnote omitted); *see also Shannon v. New York City Transit Authority*, 332 F.3d 95, 104 (2d Cir. 2003) ("Whether or not reassignment from driving buses to cleaning them could qualify as an accommodation, the record shows that no cleaner positions were vacant[.]") (emphasis added); *Bristol v. Board of County Com'rs of County of Clear Creek*, 281 F.3d 1148, 1167 (10th Cir.) ("We have held that a reasonable accommodation may include reassignment to a vacant position if the employee is

qualified for the job and it does not impose an undue burden on the employer.")

(emphasis added) (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1169 (10th

Cir. 1999)), *vacated in part on reh'g en banc*, 312 F.3d 1213 (10th Cir. 2002).

As one district court has explained an employer's duty to reasonably

accommodate:

> A reasonable accommodation, therefore, is one that would enable
> an employee with a disability to enjoy an equal opportunity for benefits
> and privileges of employment as are enjoyed by employees without
> disabilities. <u>It includes reassignment to a vacant position.</u> <u>Reasonable
> accommodation, however, does not require that an employer create a
> light-duty position or a new permanent position.</u> But, <u>if</u> an employer has
> a <u>vacant</u> light-duty position or a <u>vacant</u> permanent position for which the
> disabled employee is qualified, it would be a reasonable accommodation
> to reassign the employee to that position.  If the position was created
> as[a] temporary job, the reassignment to that position need only be for
> the temporary period of the job.  Therefore, if a light-duty job is a
> temporary job, reassignment to that job need only be for the temporary
> period of the job, and an employer need not convert a temporary job into
> a permanent one.  However, if a light-duty job is a permanent job, the
> assignment to the job must be for the entire time the job exists.
> Obviously, the employer is not required to reassign a disabled person to
> a <u>vacant</u> position unless the disabled person is qualified for the position.
> A disabled person is qualified for a <u>vacant</u> position if he can perform the
> "essential functions" of the position, with or without a reasonable
> accommodation, such as a restructuring, with regard to the position. 42
> U.S.C.A. § 12111(8) & (9).

*Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1492 (M.D. Ala. 1994) (emphasis

added).  Therefore, as articulated in *Howell*, a reasonable accommodation under the

ADA does not require the creation of a new position, or that an employer create an

opening for an existing position that is consistent with the qualified individual's restrictions.

In opposition to summary judgment, Richardson has not pointed to any contrary evidence in the record factually refuting the lack of any vacant sit-down tugger positions during the time in which he sought an accommodation.  Relatedly, he has not challenged the legal underpinnings of *Lucas* or *Howell*, or demonstrated with any supporting legal authority why his situation is distinguishable from either case.

Instead, Richardson primarily argues (without citing to any persuasive, much less controlling, legal authority) that moving someone from a sit-down tugger position to a stand-up one to create a vacancy for him to fill would be a reasonable accommodation.   In support of this position, Richardson relies heavily upon McDaniel's speculative statement that most tuggers prefer stand-up positions so that they can finish their work quickly.  (Doc. 33 at Ex. 1 ¶ 3).  However, McDaniel's declaration does not establish who these tuggers are, much less substantiate how McDaniel would have personal (as opposed to hearsay) knowledge of their preferences.

In particular, just because McDaniel may have personally preferred working in the capacity of a stand-up tugger, this does not mean that every tugger operator

shares this same opinion, much less that every sit-down tugger would be willing to be reassigned to a stand-up tugger position.   For example, Richardson has not identified a specific HMA employee who was willing to swap tugger positions in order to create a vacancy for him.

More importantly, even if Richardson were equipped with evidence that a co-employee was willing to consent to such a change, *Lucas* (as well as other cases) makes it clear that, under the ADA, HMA was not obligated to bump another employee in order to reassign Richardson to a sit-down tugger job.   Put differently, an employer's duty to <u>reasonably</u> accommodate under the ADA does not <u>require</u> it to reassign one employee from his or her sit-down tugger position to an existing stand-up tugger vacant position in order to create a sit-down tugger job vacancy for Richardson to fill.   Accordingly, Richardson has failed to substantiate his ADA reasonable accommodation claim as a matter of law.

## V.   CONCLUSION

Therefore, for the foregoing reasons, HMA's Motion for Summary Judgment is due to granted, and Richardson's Motion for Reconsideration is due to be granted in part and denied in part.   A separate order will be entered.

**DONE** and **ORDERED** this the 22nd day of July, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge